UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/18/10
```

MAXWOOD MUSIC LIMITED,

                    Plaintiff,                    08 Civ. 1730

        -against-                                 OPINION

DARON MALAKIAN, individually and
doing business as MALAKIAN
PUBLISHING, and SERV TANKIAN,
individually and doing business as
SHATTERED MIRRORS PUBLISHING,

                    Defendants.

------------------------------------X

A P P E A R A N C E S:


            Attorneys for Plaintiff

            SONNENSCHEIN NATH & ROSENTHAL LLP
            1221 Avenue of the Americas
            New York, NY  10020
            By:  David R. Baum, Esq.
                 Nicholas J. Tardif, Esq.


            Attorneys for Defendants

            PRYOR CASHMAN LLP
            7 Times Square
            New York, NY  10036
            By:  Donald S. Zakarin, Esq.
                 Ilene S. Farkas, Esq.
                 M. Mona Simonian, Esq.

**Sweet, D.J.**

In this action the Plaintiff Maxwood Music Limited ("Maxwood" or the "Plaintiff") sought a declaration pursuant to the Copyright Act, 17 U.S.C. § 101 et seq., and 28 U.S.C. § 2201, that a musical composition entitled "B.Y.O.B." that is embodied on the album Mezmerize, which was recorded and released by the band "System of a Down," is a joint work co-authored by songwriter Casey Chmielinski p/k/a Casey Chaos ("Chmielinski") and that Maxwood owns an equal and undivided fifty percent (50%) share of "B.Y.O.B." together with Defendants Daron Malakian ("Malakian"), d/b/a Malakian Publishing, and Serj Tankian ("Tankian"), d/b/a Shattered Mirrors Publishing (together, the "Defendants"). Upon all the proceedings had herein and the findings of fact and conclusions of law set forth below, judgment will be entered dismissing the claims of Maxwood and declaring Defendants the authors of "B.Y.O.B."

This hard-fought litigation tried before the Court from November 30, 2009 to December 8, 2009 presented difficult issues of credibility and creativity between two musicians, former friends, with respect to the authorship of "B.Y.O.B.," a successful hard-rock song that received a

1

Grammy Award in 2005.   The parties' skilled counsel have
substantially assisted the Court by their diligent
presentation of these issues.

The determining events took place in 2002 and
2003 and the memories of the principals have been blurred
by time and the circumstances of their relationship, which
included the use of mind-altering substances.   In a further
complication, the documentary record inaccurately reflected
the intricacies of the publication and copyrighting of
"B.Y.O.B."   However, Malakian presented the most credible
and consistent account of these issues.

## Prior Proceedings

This action was commenced by Maxwood on February
21, 2008.   Issue was joined, and discovery proceeded.

The trial and submission of evidence was
completed on December 8, 2009.   Final argument was held on
February 4, 2010.

**Findings of Fact**

### The Parties and Related Entities

Plaintiff Maxwood is a music publishing company located in the United Kingdom. (Joint Pre-Trial Order ("JPTO") § V, ¶ B.) Maxwood brought this suit as the assignee of certain rights claimed by Chmielinski, pursuant to a June 2, 2006 publishing agreement between Maxwood and Chmielinski that included Chmielinski's claimed rights in "B.Y.O.B." (the "Maxwood Publishing Agreement").

Chmielinski is a songwriter and recording artist. He is the principal member of the band "Amen." (JPTO § V, ¶ A; Tr. 10:3-19.)[1] Amen has recorded six full-length albums, several of which have been released on independent and major record labels. (Tr. 12:17-14:19.) Chmielinski authored all but one of the songs recorded on those albums. (Tr. 14:22-25.) Chmielinski has won or been considered for awards for Man of the Year and Second Best Singer of the Year. (Tr. 16:16-25.)

---

[1]     "Tr." denotes a citation to the trial transcript.

In the Maxwood Publishing Agreement, Chmielinski assigned his rights in certain songs he claims to have written or co-written, including his claimed interest in the song "B.Y.O.B.," in return for a $50,000 advance and the payment of royalties after recoupment of the advance. (JPTO § V, ¶ H; Ex. 41 at ¶¶ 1, 17, and MAX 00649; Ex. PPP; Ex. RRRR at 14:13-20, 50:10-13.)[2]  The Maxwood Publishing Agreement described Chmielinski's interest in "B.Y.O.B." as 50%, or "in no event less than a 1/3 share." (Ex. 41 at ¶ 17; see also Ex. TT at ¶ 20.)  When Maxwood entered into the Maxwood Publishing Agreement, Chmielinski provided no extrinsic evidence or specific details of his alleged co-authorship with Malakian. (Ex. RRRR at 73:12-18, 102:4-103:7, 104:6-106:17, 132:21-134:17, 199:14-201:4; Ex. SSSS at 99:22-100:21; 113:10-25.)

Malakian is a songwriter, recording artist and the lead guitarist for the band System of a Down.  Malakian Publishing is Malakian's publishing company. (Compl. ¶¶ 2, 8; Malakian Answer, dated May 27, 2008, ¶¶ 2, 8).

Tankian is a songwriter, recording artist and the lead singer of System of a Down.  Stunning Suppository

---

[2]      "Ex." denotes a citation to a trial exhibit.

Sounds (incorrectly sued herein as Shattered Mirrors
Publishing) is Tankian's publishing company. (Compl. ¶ 9;
Tankian Answer, dated May 27, 2008, ¶ 9.)

System of a Down, formed in 1994 or 1995 and
performing through 2006, released five albums that sold
approximately 20 million copies worldwide, and has been
nominated for three Grammy awards. "B.Y.O.B." won the 2005
Grammy award for Best Hard Rock Performance. (Tr. 500:5-
502:23, 608:3-9, 609:17-24; Ex. TTT.) The four members of
System of a Down are Malakian and Tankian, as well as John
Dolmayan and Shavo Odadjian. (Tr. 608:10-23, 722:2-6.)
Malakian and Tankian are the primary songwriters for System
of a Down. (See Tr. 616:19-617:9, 746:13-15.)

### The Relationship Between Chmielinski and Malakian

Chmielinski and Malakian met at the "Big Day Out"
music festival in Australia and New Zealand in January
2002. Both System of a Down, Malakian's band, and Amen,
Chmielinski's band, performed at this festival. (JPTO § V,
¶ D; Compl. ¶ 12; Tr. 26:7-9; 230:22-231:3; 759:20-760:2.)
Malakian was impressed by Chmielinski and his band. (Tr.
846:19-22.) After a chance encounter in Los Angeles in the

5

fall of 2002 (Tr. 778:3-18, 994:5-15), Chmielinski and
Malakian got together, going to record stores and playing
music together.  In December 2002, they were joined by a
drummer, Zach Hill ("Hill"), as set forth below in the
findings with respect to the creation of "B.Y.O.B."  During
these sessions, both men were using drugs, Malakian
marijuana and Chmielinski prescription medication.  (Ex. 83
at 54:19-55:8, 74:4-9, 176:18-177:23; Tr. 936:20-937:4.)

        In May 2003, Malakian signed Chmielinski as the
first artist on his record label, EatURMusic, which is
affiliated with Columbia Records.  The record deal paid
Chmielinski one hundred thousand dollars ($100,000) as an
advance against royalties for the release of the album
Death Before Musick.  Upon the release of that album in
2004, Malakian praised Chmielinski to music industry
magazines, saying that rock music was "missing people like
Casey," touting him as a "visionary" who "ain't a fake" and
"really cares," and as a multi-instrumentalist who wrote
"undeniably great rock songs" with "really great" lyrics.
(Exs. 84, 85; Tr. 848:20-852:20, 854:8-12, 855:4-15, 856:4-
12.)  Malakian performed one of his songs on stage at a
festival in 2004.  (Tr. 858:9-859:3.)

Thereafter the relationship cooled partially as a result of accusations made against Chmielinski (Tr. 811:5-813:7) and because Malakian believed that he was owed money arising out of advances he made in connection with the Amen recordings. (Tr. 969:21-972:16.) At a dinner in late 2004 or early 2005, both Chmielinski and Malakian knew the relationship was coming to an end. (Tr. 838:25-840:12.) Their last communications were brief conversations relating to the 2% of the songwriter's share Malakian designated for Chmielinski in the summer of 2005, as described below.

### The Creation of "B.Y.O.B."

Chmielinski testified that he began working on music alone with Malakian, i.e., "jamming" together, at Malakian's house in early March 2002 (Compl. ¶ 12; Tr. 28:25-29:12), but later testified that he might have started working with Malakian in April 2002 instead (Tr. 231:15-232:8). Chmielinski further testified that he and Malakian spent 2 or 3 days together each week for a year and a half, beginning at the end of February 2002, and that they worked on songs together at Malakian's house 20 to 30 times between March 2002 and December 2002. (Tr. 37:4-11, 38:8-39:8, 133:16-134:6.) Chmielinski also testified that

7

during Chmielinski's first visit to Malakian's house in
early March 2002, Malakian played an opening guitar riff
that ended up in "B.Y.O.B." and that, between the first and
second "sessions" at Malakian's house, Chmielinski wrote
the lyric, "Why don't presidents fight the war," which
Malakian later used in the bridge section of "B.Y.O.B."
(Tr. 28:25-29:7, 32:2-10, 37:4-11, 145:14-146:7, 176:9-
178:25.)   The alleged precursor to "B.Y.O.B." will be
referred to as the "Jam Sessions Song."   The evidence, set
forth below, established that the dates in Chmielinski's
testimony are inaccurate.

        Malakian testified at trial that he did not
reconnect with Chmielinski in Los Angeles until September
2002.   (Tr. 778:3-18, 994:5-15.)   Malakian claimed that his
memory at trial was "a lot more clear than it was at the
time of [his] deposition" one year earlier.   (Tr. 888:2-
10.)   Malakian testified that he bought his house in Los
Angeles in January 2002 and did not move out of his
parents' house until September 2002.   (Tr. 889:3-13.)
Chmielinski never visited Malakian's parents' house and
never saw Malakian's parents in the house where he claimed
to be working with Malakian in March or April 2002.   (Tr.
122:2-10, 773:8-13.)   Malakian further testified that he

                              8

could not have seen Chmielinski prior to September because they met while Malakian was with a girl whom he had met on tour over the summer. (Tr. 778:3-779:10.)

System of a Down toured North America and Canada from February 14, 2002 until the beginning of March and then immediately went to Europe, touring there until April 1, 2002. (Exs. AAA, BBB; Tr. 540:18-542:6, 544:17-21, 545:4-546:6, 761:20-762:4, 764:7-8.) In June 2002, System of a Down had a few performances on the East coast and Las Vegas and was not in Los Angeles. (Ex. CCC; Tr. 540:18-541:10, 546:7-24.) System of a Down toured continuously from July 6, 2002 through September 8, 2002 as the headlining act of the annual U.S. Ozzfest tour, and Malakian was absent from Los Angeles during that period. (Ex. DDD; Tr. 183:2-7, 540:18-541:10, 546:25-547:19, 766:19-24.)

In August of 2002, Chmielinski was in England touring with his band, Amen. Chmielinski admitted that Amen prepared for this tour with at least two weeks of rehearsals. (Tr. 138:3-139:11.) Chmielinski testified that in addition to his brief tour in England, he remained in England for an extended period of time producing another

9

group and thus was not working with Malakian during this
time.   (Ex. WW; Tr. 138:3-139:21, 180:2-19, 238:2-239:18.)

In light of System of Down's tour schedule
between February 2002 and September 2002, Amen's August
2002 tour, and Chmielinski's testimony that he remained in
England in September 2002 to produce a band, Chmielinski's
testimony that he spent time with and worked on music with
Malakian several times a week beginning in March (or April)
2002 and continuing for a year and half was not accurate.

Following the conclusion of the Ozzfest tour in
early September 2002, Malakian and Tankian began
rearranging and re-mastering tracks for System of a Down's
album entitled Steal This Album.  Extensive work on this
album was done in the period between September 2002 and
November 2002.   (Tr. 769:4-770:8.)

Malakian and Chmielinski saw each other for the
first time after the Big Day Out tour, on Melrose Avenue in
Los Angeles, in the fall of 2002.  Malakian fixed the time
because he was shopping with a friend whom he had met
during the Ozzfest 2002 summer tour.

10

Stephanie Hobgood ("Hobgood"), Chmielinski's

girlfriend at the time, recalled being at Malakian's house

two or three times and listening to music being created by

Malakian and Chmielinski. (Ex. 83 at 20:9-21:5.) Hobgood

and Chmielinski both testified that Malakian's girlfriend

from New York, a short blond girl with glasses, was present

at Malakian's house every time Hobgood was allegedly

present when Chmielinski and Malakian were working on

music. (Tr. 143:16-145:13, 233:20-235:19; Ex. 83 at 19:9-

24, 20:9-21:5, 21:12-15.) Since Malakian did not meet this

girlfriend until the 2002 Ozzfest summer tour, she was not

at his house before September 2002. (Tr. 728:3-729:25,

741:21-24, 766:19-24, 767:17-768:10, 792:10-20, 986:2-

987:21.)


Malakian testified that when he and Chmielinski

began spending time together, they primarily went to the

record store and listened to music at Malakian's house.

(Tr. 770:24-772:11, 779:18-25.)


Malakian had been considering a side project from

System of a Down. He told Chmielinski that he would like

to hear how Chmielinski's voice sounded on certain songs

that he had written with Chmielinski's voice in mind. (Tr.

11

780:24-782:3, 783:21-784:16.)  In a 2004 interview posted
to Toazted.com — before the commercial release of
"B.Y.O.B." and therefore before any issues of authorship
arose — Chmielinski stated that the songs he played with
Malakian during these jam sessions were already written by
Malakian prior to Chmielinski's involvement in the project:
"We met on Big Day Out and [Malakian] said Amen was his
favorite rock and roll band in the world and then he called
me one day and said he wrote some songs with my voice in
mind."  (Ex. RRR; Tr. 290:17-291:10.)

In Hobgood's presence, Malakian and Chmielinski
discussed a joint project that they named "Scars On
Broadway" and created a number of songs in the process.
According to Chmielinski, approximately fourteen songs, or
song ideas, were created for the project.  (Tr. 39:9-15,
93:23-94:9.)  At trial, Malakian identified only five or
six songs that were recorded as part of the Scars On
Broadway project.  (Tr. 783:25-784:1.)  Malakian testified
at his deposition that at least two additional songs were
written as well, bringing his total estimate of songs to
approximately seven or eight.  (Tr. 948:1-21.)

Chmielinski suggested adding Hill as a drummer,
based on his performances as a stand-in drummer for Amen on
a recent tour in Europe. (Tr. 47:1-22.) In late December
2002, Chmielinski introduced Malakian to Hill at a local
club in Los Angeles. (Tr. 47:23-25; Ex. QQQQ at 45:25-
46:3, 59:6-16.) Shortly thereafter, Hill came to
Malakian's house and the three musicians worked on the
material together. (Tr. 47:15-22, 49:22-50:6, 783:21-
785:6, 794:5-795:6; Ex. QQQQ at 46:7-47:9, 61:22-63:10,
102:2-18, 112:2-24, 118:3-119:23, 121:11-123:1.) Malakian
wrote a short song in connection with the Scars On Broadway
project — the Jam Sessions Song — with the 1yrics, "Why
don't presidents fight the war/Wasn't it the way it was
before?" The Jam Sessions Song was eventually incorporated
into the bridge of "B.Y.O.B." by Malakian, except for the
opening guitar riff, which Malakian used in the opening of
"B.Y.O.B." (Tr. 30:4-24, 32:2-10, 35:18-36:1, 53:17-54:4.)

When Hill, Chmielinski and Malakian began playing
music together, they recorded several songs, including the
Jam Sessions Song, on a low-fidelity boom box cassette
machine (the "Boom Box Recording"). Some months later, the
three musicians recorded the Jam Sessions Song and others
at Undercity Recording Studio (the "Studio Recording").

13

(Ex. F at Track 1; Ex. 2 at Track 2; Tr. 50:15-51:2, 794:5-23, 804:10-805:17; Ex. QQQQ at 102:2-15, 116-24:117:3, 117:22-118:2, 151:14-20, 154:10-12, 155:8-12.)

Chmielinski testified that both the Boom Box Recording and the Studio Recording accurately reflected the state of the Jam Sessions Song at the times they were recorded. (Tr. 183:17-184:5; Ex. F at Track 1; Ex. 2 at Track 2.) There is no evidence of any recordings by Chmielinski and Malakian after the Studio Recording. (See Tr. 1001:4-15.)

Chmielinski obtained a copy of the Studio Recording in discovery and, contrary to the allegations as set forth in the Complaint, testified that after making the Studio Recording, he and Malakian continued working without Hill for another "seven to eight" months on what allegedly became "B.Y.O.B." (Tr. 52:24-53:8, 53:17-54:12.) He placed the completion of the song around December 2003 rather than, as alleged in the Complaint, at a time prior to the creation of the Studio Recording. (Compare Compl. ¶¶ 16-17 with Tr. 86:17-25, 160:18-161:7, 166:15-24.)

14

Chmielinski's testimony with respect to the

Studio Recording changed as evidence was introduced.  (See

Tr. 49:17-50:14, 134:16-137:14, 158:15-159:3, 165:25-

166:24.)  Initially, Chmielinski testified that he, Hill

and Malakian went into the recording studio in June 2003

and that Hobgood was present at the studio.  (Tr. 51:3-6,

134:16-137:14.)  When evidence established that he

terminated his relationship with Hobgood and sought a

restraining order against her in May 2003, Chmielinski

testified that the recording studio session occurred

earlier.  (Tr. 158:15-159:3, 165:25-166:24.)


Chmielinski testified that he and Malakian worked

on and co-wrote songs, including the Jam Sessions Song, in

the months prior to Hill's allegedly joining them in

December 2002 and that he and Malakian continued to work on

and co-write songs after Hill departed following the

recording studio session.  (Ex. F at Track 1; Ex. 2 at

Track 2; Tr. 29:3-7, 38:8-39:8, 54:9-12.)  However, Hill

testified that Malakian wrote all of the songs before the

three began working together, including the Jam Sessions

Song, and that while the musicians worked on playing the

songs in their sessions together, Chmielinski wrote nothing

15

and had not worked with Malakian prior to Hill's arrival.
(Ex. QQQQ at 78:25-79:12, 92:22-93:12, 96:3-17.)

No recordings provide any evidence that
Chmielinski worked alone with Malakian prior to December
2002.  In addition, Chmielinski's trial testimony that he
continued to work with Malakian on the Jam Sessions Song
for months after the Studio Recording is denied by Malakian
and is uncorroborated.  (Tr. 213:11-214:25.)

Malakian testified that when he began playing
music with Chmielinski and Hill in December 2002, he had
already written the five or six songs they played at their
jam sessions (Tr. 290:17-192:10, 783:21-784:22; see also
Ex. RRR; Ex. QQQQ at 62:9-64:4), that he directed Hill and
Chmielinski as to how to perform the songs and that
Chmielinski wrote nothing (see id.; Tr. 787:8-788:11,
796:1-797:12).  Hill testified that Chmielinski had
difficulty remembering the lyrics Malakian wrote.  (Ex.
QQQQ at 45:18-46:23, 62:9-64:4, 65:11-66:1.)

On both the Boom Box Recording and Studio
Recording, the Jam Sessions Song is approximately one
minute long.  It consists of a verse and a chorus, totaling

16

approximately 30 seconds, which is simply repeated.  There
is very little difference musically or lyrically between
the Boom Box Recording and the Studio Recording of the Jam
Sessions Song.  (Ex. F at Track 1; Ex. 2 at Track 2.)

Other than the first line of the chorus (i.e.,
"Why don't presidents fight the war"), which Malakian
testified that he created (Tr. 798:14-20), no lyrics from
the System of a Down's commercially-released "B.Y.O.B."
appear on either the Boom Box Recording or the Studio
Recording.  Other than the opening guitar riff in
"B.Y.O.B.," the first line of the chorus, and the bridge
section of the Jam Sessions Song, also created by Malakian,
no other portion of "B.Y.O.B." — including the music and
lyrics of the verses, chorus or musical introduction —
appears anywhere on either recording.  (Compare Ex. F at
Track 1 and Ex. 2 at Track 2 with Ex. A at CD, Track 2 and
D0994; Tr. 797:13-803:5, 820:20-823:2.)  "B.Y.O.B." is more
than four minutes and twenty seconds long.  Malakian's
testimony with respect to the creation of the Jam Sessions
Song is credible, whereas Chmielinski's testimony is
inconsistent and uncorroborated except for the lyric sheets
he produced.

17

Chmielinski testified that he created a number of handwritten lyric sheets during his work with Malakian that reflect the organic development of "B.Y.O.B." (Exs. 51-56, 73-75), as well as several other songs developed for the Scars On Broadway project.  Those songs were identified at trial by the working titles, "Matter of Fact" (Exs. 58, 78), "Animal" (Exs. 61, 62) and "Somebody Get Me a Shotgun" (Ex. 60).  He testified that he saved the lyric sheets, consistent with his practice of saving lyric sheets to reprint as artwork in the paper liner note inserts of his commercially-released albums.  (Tr. 21:1-6, 21:14-23:13; Exs. 80, 81).

Hill testified that he saw Chmielinski creating lyric sheets during the few months that he worked with Chmielinski and Malakian on the Scars On Broadway project. Hill also testified that Chmielinski read from the lyric sheets while performing vocals in the recording studio (Ex. QQQQ at 128:11-14) and that he could not recall a time when Chmielinski performed vocals without reading from the lyric sheets (id. at 128:18-25).

Chmielinski initially testified that Hobgood saw one of the lyric sheets (Ex. 51) prior to the commercial

18

release of "B.Y.O.B." and testified that he created that
same lyric sheet in or about December 2003, approximately
eight months after he terminated his relationship with
Hobgood and sought a restraining order against her.  (Tr.
161:8-162:3, 162:22-163:12, 164:2-23; Ex. XX.)  Chmielinski
then testified, contrary to his prior testimony, that
Hobgood could not have seen that same lyric sheet prior to
the commercial release of "B.Y.O.B."  (Tr. 165:25-167:21.)
Moreover, Hobgood testified in her deposition that she had
never seen that same lyric sheet.  (Ex. 83 at 49:14-15,
51:13-18.)


        Prior to going into the studio to rehearse songs
for the next System of a Down album, Malakian began to
write songs to bring to the band, including the song that
became "B.Y.O.B."  (Tr. 757:20-758:10, 813:8-12.)  After he
had written the music to the verses and chorus of
"B.Y.O.B.," Malakian decided to use a short, one-minute
song he had previously written as the bridge, or middle
eight, section in "B.Y.O.B."  (Tr. 813:13-814:8.)


        When Malakian brought "B.Y.O.B." to System of a
Down, the music to "B.Y.O.B." was complete:  Malakian had
written the musical introduction and the music to the

verses, chorus and bridge sections. The structure of the song was complete. Malakian wrote the chorus lyrics, "Everybody's going to the party, have a real good time; Dancing in the desert, blowing up the sunshine," and had written some, but not all, of the lyrics to the bridge section. Malakian had not written, and the song lacked any, verse lyrics. (Tr. 635:15-20, 637:19-638:22, 683:24-685:8, 813:8-814:8, 814:20-816:20; see also Ex. QQQQ at 95:17-96:10).

At rehearsal, Malakian explained to the other members of System of a Down what "B.Y.O.B." meant to him, describing depictions of war as a party in the desert and a class structure that sends a disproportionate number of underprivileged youth to fight in our country's wars. (Tr. 635:15-20, 636:8-638:22, 683:24-685:8, 731:4-8, 815:7-15.)

After Malakian presented the song, System of a Down recorded a run-through of "B.Y.O.B." (the "System Rehearsal Recording"). The System Rehearsal Recording depicts the band's performance of the entire song, "B.Y.O.B.," as it existed early in the rehearsal process. (Ex. D; Tr. 657:14-658:7, 815:21-816:12.)

20

On the System Rehearsal Recording, Tankian can be heard singing lyrics to the chorus and mumbling or "scatting" the verses, because the verse lyrics had not yet been written.  Malakian sings the bridge lyrics, including the "Why don't presidents fight the war" lyric.  (Ex. D; Tr. 659:6-661:1, 816:13-817:4.)

In scatting through the verses, Tankian was attempting to work out the vocal phrasing and melody, to use as a guide for lyrics to be added later.  (Tr. 659:6-661:1.)  Tankian took the System Rehearsal Recoding to his home studio and wrote the lyrics to the verses of "B.Y.O.B."  (Tr. 638:23-640:12.)

Tankian, a politically-active individual and artist, testified about his inspiration for his lyrics, including his feelings about the war in Iraq.  (Tr. 640:13-25.)

Tankian testified that, consistent with his normal practice, he used his own pre-existing poetry from his journal in writing the verse lyrics to "B.Y.O.B."  (Ex. L; Tr. 629:9-630:4, 646:11-647:1, 647:9-648:8.)  In his journal, Tankian had written a poem that included the line,

21

"They broke into Fort Knox, stole the timeless shiny dream of a nation." (Ex. L at D0969; Tr. 648:16-649:14.)  This line is also contained in Tankian's poem entitled "The War That No One Won," which he has publicly performed. (Ex. M; Tr. 653:23-654:3, 655:8-656:13.)  Tankian used this line of poetry in "B.Y.O.B.," modified to fit the vocal phrasing of the verse:  "Breaking into Fort Knox stealing our intentions." (Ex. L at D0969; Ex. N; Tr. 649:6-14.)

Tankian's journal also included a poem he had written that included the line, "Barbarisms by the Barbaras, Victorious Victorias, kneeling Neils," and later in the same poem, a line that begins, "Roses disappearing into Moses' mouth . . . ." (Ex. L at D0980.)  Tankian used these lines from his poetry in the following lyrics for the "B.Y.O.B." verses:  "Barbarisms by Barbaras/With pointed heels/Victorious Victorias kneel/For brand new spanking' deals" and "Kneeling roses disappearing into/Moses' dry mouth." (Ex. L at D0980; Ex. N; Tr. 652:20-653:9.)

Tankian testified that he writes in his poetry journals sequentially, from front to back.  While not all of his poems are dated, based on the dates that do appear in Tankian's poetry journal, the first poem from which

22

Tankian derived lyrics for the "B.Y.O.B." verses was written between February 2, 2002 and October 10, 2003. (See Ex. L at D0957, D0969, and D0973; Tr. 649:15-650:22, 654:18-655:7, 707:17-708:12.) The second poem from which he derived lyrics follows a poem written on December 22, 2003. (Ex. L at D0979-980; Tr. 654:7-17.) Tankian brought the verse lyrics to System of a Down at the next rehearsal. (Tr. 629:9-630:1, 638:23-640:12.)

In excess of 30-40 songs were brought to the band in connection with the rehearsals for the album Mezmerize. Malakian wrote the majority of these songs. Typically, System of a Down rehearses significantly more songs than it ultimately releases on any given album. (Tr. 631:17-632:17, 633:14-17, 725:17-726:16, 751:3-19, 758:11-19.) Because so many songs were presented during rehearsals, the band decided that they had enough quality songs for two full albums. (Tr. 631:17-632:25, 725:14-726:9, 759:2-19.)

Sony/ATV Music Publishing, LLC ("Sony/ATV") has an exclusive co-publishing agreement with the members of System of a Down (the "SATV Agreement"). (Ex. K; Tr. 337:19-24, 339:11-13.) Pursuant to the terms of the SATV Agreement, as amended, each member of System of a Down

23

assigned to Sony/ATV 50% of his ownership interest in all songs written or co-written by him during the term of the agreement.  (Ex. K.)  The remaining 50% of the publisher's share of each song covered by the agreement is divided equally between the publishing designees of the four members of System of a Down, regardless of the authorship percentages of each song.  (Ex. K at ¶ 1(a), Sched. A.)

As a result of this assignment, Sony/ATV acquired 50% legal ownership of the copyrights in every song on Mezmerize, including "B.Y.O.B."  The remaining 50% legal ownership of the copyrights in the songs is divided evenly (12.5% each) among the publishing designees of the four System of a Down members.  (See id.; Tr. 340:2-12.)

In May 2005, System of a Down released "B.Y.O.B." as the first single from Mezmerize.  "B.Y.O.B." became the one of the top songs in the country.  (JPTO § V, ¶¶ E, F; Tr. 511:15-24.)  The album, Mezmerize, was also released in May 2005, reached the number one position on the Billboard 200 chart, and sold between 1 and 5 million copies.  (JPTO § V, ¶ G; Tr. 500:1-10, 511:10-11, 511:25-512:10, 631:6-12; Ex. RRRR at 207:14-22; Ex. MM.)  Another album, Hypnotize,

24

was released six months later, in November 2005.  (Tr. 500:1-10, 631:6-12.)

The liner notes for Mezmerize include 1yrics and writing credits for each song on the album.  Malakian and Tankian reviewed and approved the liner notes and writing credits before they were finalized, as is their practice with all System of a Down albums.  (Ex. A at D0990-1004; Tr. 665:12-15, 823:3-13.)  In the Mezmerize liner notes for "B.Y.O.B.," Malakian is credited as writing the music and Malakian and Tankian are credited with writing the lyrics. (Ex. A at D0994.)

The credible evidence established that Malakian and Tankian wrote "B.Y.O.B."

### The Creation of Rights to "B.Y.O.B."

In general, royalties generated by songs are divided equally into a publisher's share and a writer's share.  Publishers and writers can assign, sell or transfer, by gift or otherwise, in whole or in part, the right to be paid royalties to persons or entities who neither wrote the song nor have any copyright ownership in

25

the song.  (Tr. 340:2-12, 394:7-22, 395:17-22; see also Tr. 674:10-18.)  As a result, the writer's share of royalties may be paid to people who had nothing to do with writing a song.  (Tr. 394:7-22.)

When Mezmerize was released in May 2005, the members of System of a Down discussed and agreed upon the method for dividing the writer's share of royalties for each song on the album.  (Tr. 664:13-665:11.)

To provide a clear method of determining the writer's royalty splits for the songs on Mezmerize and Hypnotize, Tankian created a chart that listed each song, with a column for each portion of the song, both lyrically and musically (i.e., verse music, verse lyrics, chorus music, chorus lyrics, bridge music, and bridge lyrics) with initials to designate who wrote each portion of each particular song.  Tankian also devised a system ascribing a point value for each portion of each song, totaling 100 points.  The points could be added up to determine how to split the writer's royalties for each song.  (Ex. R; Tr. 666:2-667:3, 667:18-668:22, 824:14-825:19.)

26

Next to the six separate authorship columns,
Tankian's chart included a seventh column for the writer's
royalty splits, which did not necessarily correspond to the
authorship percentages in the six authorship columns.  (Ex.
R; Tr. 666:5-18, 825:16-24.)  The grant of a right to be
paid a share of the writer's royalties did not impact
authorship credit or copyright ownership of these songs.
(Tr. 669:24-670:1, 670:25-671:14, 674:10-18, 827:9-828:6.)

On or about May 16, 2005, Malakian and Tankian
went through this chart together, assigned authorship
percentages to each song, agreed upon the writer's royalty
splits, and sent this chart to the band's management to
provide to Sony/ATV.  (Ex. R; Tr. 669:10-670:16, 673:21-
674:9, 675:9-18, 826:6-22, 830:11-15.)

The chart shows that Malakian wrote all of the
music to "B.Y.O.B.," as well as the lyrics to the chorus
and the bridge, and that Tankian wrote the verse lyrics.
Pursuant to Tankian's point system, on "B.Y.O.B.," Malakian
was entitled to receive 80% of the writer's royalties for
writing all of the music plus the lyrics to the chorus and
bridge sections, and Tankian was entitled to receive 20%

for writing the lyrics to the verses.  (Ex. R; Tr. 670:17-24, 828:18-829:8.)

The chart reflects that Malakian provided Tankian with the right to be paid a 5% writer's royalty on several songs of which Malakian was the sole author (e.g., "Kill Rock N' Roll," "Lonely," "Old School Hollywood," "Heroin," and "Soldier Slide").  It is undisputed that Malakian alone authored these songs, and Malakian is the only author credited in the liner notes for Mezmerize and Hypnotize. (See Ex. A at D0994-0997; Ex. R; Tr. 670:25-672:24, 826:19-828:6.)  Malakian voluntarily gave Tankian 5% of the writer's royalties to which he was entitled on these songs. (Tr. 670:25-672:20, 826:19-827:2.)

Malakian also allocated a 2% share (from his 80% share) of the writer's royalties payable on "B.Y.O.B." to Chmielinski.  Malakian thought that, during the jam sessions with Chmielinski and Hill, Chmielinski had uttered the phrase "communist nation" on a recording of the Jam Sessions Song — although Chmielinski testified that he uttered the words "computer nation" — and Malakian had used the phrase "fascist nation" in the bridge of "B.Y.O.B." (Tr. 673:17-674:14, 817:12-21, 818:4-9, 828:18-829:8.)

28

Malakian testified that the 2% royalty interest to
Chmielinski was not granted due to any obligation (Tr.
674:23-675:8, 829:3-25, 836:11-837:6), that he did not
consider Chmielinski an author of "B.Y.O.B.," and that he
did not intend to grant him a writer credit or any
copyright ownership interest. (Ex. A; Ex. S; Ex. T; Tr.
674:10-675:8, 829:9-830:10, 830:16-831:14, 835:10-836:2.)

The authors of all songs on Mezmerize and
Hypnotize, including "B.Y.O.B.," were reflected on
Tankian's chart and in the liner notes for these albums.
Based on Malakian's instructions to provide Chmielinski
with a 2% share of the writer royalties on "B.Y.O.B.,"
Tankian listed Chmielinski only in the royalty column on
his chart. (Ex. A; Ex. R; Tr. 672:25-673:9, 673:17-674:9,
828:17-24, 830:4-10.)

Malakian also informed System of a Down's
management that he intended to gift Chmielinski a 2%
writer's royalty interest. (Tr. 528:13-529:7, 584:17-21;
Ex. 88 at 62:5-7; 93:9-16.)

After the members of System of a Down determined
the writer's royalty splits, it was their management's

29

responsibility to provide that information accurately to
Sony/ATV, the band's music publisher.  (Tr. 525:25-526:11.)
So, when Tankian forwarded the chart to the band's manager
on May 16, 2005, he and Malakian assumed their manager
would correctly communicate the song information to
Sony/ATV and that Sony/ATV would register copyrights and
administer the songs on Mezmerize in accordance with the
information contained in the chart. (Ex. R; Tr. 675:9-22,
830:11-15.)


        Braden Asher ("Asher"), the System of a Down
employee who forwarded this information to Sony/ATV, did
not understand the difference between an actual authorship
percentage and the entitlement to a writer's share of
royalties.  (Tr. 527:25-528:12; Ex. 88 at 88:20-89:25.)
Asher did not provide Sony/ATV with Tankian's chart or any
document that differentiated between the actual writers of
the songs on Mezmerize and the recipients of a writer's
share of royalties for those songs.  (Tr. 415:22-416:3.)
Instead, he sent the Sony/ATV New Song Delivery Forms and
an excel spread sheet of writer's royalty splits from
System of a Down's management, within a day or two of each
other in June 2005.  (Tr. 347:24-348:11.)   The Sony/ATV New
Song Delivery Form was a simple one-page form, intended to

30

be used when the writers and recipients of the writer's share of royalties for a given song are the same. Sony/ATV's representative acknowledged that this form can cause confusion when there is a distinction between the two. (Ex. 48; Tr. 416:5-417:12.) Neither of these documents differentiated between the actual writers of the songs on Mezmerize and the recipients of a writer's share of royalties for those songs, as had been done on Tankian's chart and on the liner notes for the album, which Tankian and Malakian had reviewed and approved.

Without specific instructions to distinguish between the writer's share of royalties and writer credit, Sony/ATV treats the individuals listed as receiving a writer's share of royalties as the authors of the songs in the percentages that correspond to their share of the royalties. (See Ex. 48; Ex. 26; Tr. 395:17-25, 409:24-410:6, 416:5-417:12.) Because they did not see the documents that their management provided to Sony/ATV, Malakian, Tankian and the other members of System of a Down were unaware that a mistake had been made. (Tr. 399:22-400:1, 402:4-7, 450:2-10, 675:9-25, 830:11-15.)

31

Sony/ATV registered "B.Y.O.B." in its song database as being written 78% by Malakian, 20% by Tankian, and 2% by Chmielinski. Sony/ATV also registered "Old School," "Soldier Slide," "Heroin" and "Radio/Video," as being written 95% by Malakian and 5% by Tankian. (Ex. 33; Ex. 26; Tr. 393:16-394:6, 396:23-397:9, 412:25-413:6, 414:4-24; see also Ex. 49.) Sony/ATV did not compare the writer credits with the liner notes on Mezmerize, nor did it review information previously provided by the record label, SonyBMG, which reflected that Tankian and Malakian were the only writers of "B.Y.O.B." (Tr. 453:6-9.)

Copyright registration filings are based on the song database, so the copyright registration filed in September 2005 listed Malakian, Tankian, and Chmielinski as authors of "B.Y.O.B." Similarly, the copyright registrations for "Old School," "Soldier Slide," and "Radio/Video" listed Malakian and Tankian as authors. (Tr. 426:19-25.)

Sony/ATV uses the information in its song database to register its songs with performing rights societies such as ASCAP or BMI and provides this information to its licensing agents, including The Harry

32

Fox Corporation and Hal Leonard, which issue mechanical and print licenses on Sony/ATV's behalf, respectively. (Tr. 390:25-391:8, 400:21-401:22, 402:8-23.)

Sony/ATV also generates what it calls "label copy" from the information in its song database. The label copy is used to provide writer and publisher information for a given song to a record label for album packaging or to provide royalty percentage information for the licensing department. (Tr. 399:7-21). Label copy is often finalized after the physical album is released, as it was with Mezmerize. (Tr. 398:14-399:2.) Label copy that is designated as "final" in its system is often subsequently amended. (Tr. 399:3-6.) Sony/ATV's label copy also contained the information derived from the song database based on the forms filled out by Asher. (Ex. 33.)

Months after Asher forwarded the forms to Sony/ATV, Malakian saw a guitar magazine that transcribed "B.Y.O.B." and listed Chmielinski as a writer. Malakian contacted his management and advised them that Chmielinski was not a co-author and that this mistake should be corrected. On February 16, 2006, System of a Down's transactional attorney contacted Sony/ATV and advised them

33

that Chmielinski should not be credited as a writer on "B.Y.O.B." (Ex. 34; Tr. 432:1-15, 831:15-833:18.)

Jeff Smarr ("Smarr"), a Sony/ATV witness, testified that he misunderstood these instructions. Instead of understanding that Chmielinski did not actually write any of "B.Y.O.B.," Smarr interpreted the instructions to mean that Chmielinski was not to be identified publicly as a writer of "B.Y.O.B." (Tr. 433:16-434:4.) Sony/ATV contacted Hal Leonard, instructed them to cease printing Chmielinski's name in the writing credits for "B.Y.O.B." (Ex. Z; Ex. 40; Tr. 435:4-436:9, 437:10-14) and made a notation in its song index system reflecting, again erroneously, that Chmielinski should be considered a "silent writer" on "B.Y.O.B." (Ex. 35; Tr. 438:20-440:18.)

Neither the band nor its representatives were aware that Sony/ATV was treating Chmielinski as a silent writer and that Sony/ATV's records regarding "B.Y.O.B." remained incorrect. (Tr. 440:19-441:12, 441:25-443:22, 447:18-23.)

In September and November 2006, Sony/ATV's in-house counsel in New York was copied on two letters from

34

System of a Downs' transactional attorney to Maxwood's attorney, in which System of a Downs' attorney stated unequivocally that Chmielinski was not an author of "B.Y.O.B." and that Malakian had gifted a 2% writer's royalty interest to him. These letters were never sent from Sony/ATV's in-house counsel to the copyright department in Nashville and, as a result, Sony/ATV's records in Nashville remained incorrect. (Ex. 42; Ex. OO; Tr. 444:8-447:23, 452:25-453:6.) When Sony/ATV undertook to correct the copyright ownership of "B.Y.O.B.," it removed Chmielinski's publishing designee as a copyright claimant, but failed to eliminate Chmielinski as an author of "B.Y.O.B.," because its Nashville office was operating under the mistaken belief that Chmielinski was a "silent writer." (Ex. 44; Tr. 447:24-449:18.)

Sony/ATV finally corrected the copyright registration on October 30, 2008, when it filed another correction form with the U.S. Copyright Office, listing Malakian and Tankian as the actual and only authors of "B.Y.O.B." (Ex. GG; Tr. 454:1-22.) In addition, Sony/ATV corrected its internal song database and label copy, and informed the public performance societies and licensing agencies of the corrections made to the writer credits and

35

publishing splits for "B.Y.O.B." (Exs. JJ-LL; Tr. 455:23-460:12.)

Notwithstanding the mistakes made by Defendants' management in communicating the credit and royalty split information to Sony/ATV and Sony/ATV's processing of the incorrect information, Chmielinski was not an author of "B.Y.O.B.," but was, by way of a gift from Malakian, entitled to receive 2% of the writer's share of royalties. Malakian has since, understandably, revoked this gift. (Tr. 843:9-844:5.)

Chmielinski's Knowledge with Respect
to the Allocation of Rights

Chmielinski heard "B.Y.O.B." around the time of its release as a single in May 2005. He also purchased a copy of Mezmerize, which contained all of the credits in the liner notes and to the lyrics of the commercially-released "B.Y.O.B." (Tr. 110:1-10; 279:8-280:12.)

In July 2005, System of a Down's management contacted Chmielinski's business manager and informed him of Malakian's 2% writer's royalty gift to Chmielinski. (See

36

Ex. KKK; Ex. LLL; Ex. 29; Ex. 88 at 80:21-23; see also Ex. NN.) System of a Down's management also spoke with Chmielinski directly and informed him of the 2% gift. (Ex. 88 at 65:8-11.) According to Asher, Chmielinski was "very excited about it." (Ex. 88 at 65:12-17.) On or around August 22, 2005, the band's management asked Chmielinski whether he had made the administrative arrangements to receive his 2% royalty on "B.Y.O.B." Chmielinski confirmed that his business manager was working on it. (Ex. KKK; Ex. 88 at 61:19-62:7.)

On August 23, 2005, Malakian contacted Chmielinski by email, stating that he had made a gift to Chmielinski with respect to "B.Y.O.B.," and that he hoped Chmielinski had provided the necessary information to System of a Down's management so that Chmielinski could "get paid." (Ex. T; Tr. 834:12-836:2.)

Malakian also called Chmielinski to tell him, again, that Malakian had given him a gift of a 2% royalty interest in "B.Y.O.B." Chmielinski expressed gratitude to Malakian. (Tr. 837:11-838:9.) At trial, Chmielinski initially denied having sent or even seen these emails from his own email account, but recanted on redirect, suggesting

37

that he might have dictated his responses to his wife, who typed and sent email on his behalf. (Tr. 257:16-259:15, 262:10-24, 263:24-264:8, 269:24-271:12, 292:10-293:19.)

On February 21, 2006, Robert Reynolds ("Reynolds"), an entertainment attorney, contacted System of a Down's manager, David Benveniste ("Benveniste"), on behalf of Chmielinski. (Ex. AA; Tr. 529:8-531:9, 532:17-533:1.) In an email exchange, Reynolds informed Benveniste, for the first time, that Chmielinski felt he deserved "a higher percentage (e.g., 10%)." (Ex. AA.) Reynolds' email said that if he saw evidence that Chmielinski agreed to a 2% royalty interest in "B.Y.O.B.," then he would cease representing him. (Ex. AA.)

On February 27, 2006, Benveniste forwarded to Reynolds earlier correspondence between System of a Down's transactional attorneys and the band's music publisher, which reflected that Chmielinski had been gifted a 2% writer's interest by Malakian, and that Chmielinski tried to register this 2% interest with the performance rights organizations. (Ex. CC; Tr. 534:3-23.)

38

In September 2006, Benveniste was contacted by Colin Newman ("Newman"), Maxwood's principal officer, who stated for the first time that Chmielinski claimed to be a 50% co-author of "B.Y.O.B." and that Maxwood was entitled to a copyright ownership interest in the song. (Tr. 536:12-537:5; Ex. 42; Ex. 41 at ¶ 17 and MAX 00649.)

### The Testimony of Chmielinski with Respect to the Creation of "B.Y.O.B." Is not Credible

As set forth above, Malakian, Hill and Tankian each contradict Chmielinski's testimony concerning the authorship of "B.Y.O.B."

Subsequent to his receipt of the Studio Recording during discovery, Chmielinski "located" several handwritten lyric sheets, as discussed above. Although Chmielinski testified that he wrote these lyric sheets during the time he and Malakian supposedly worked together on the Jam Sessions Song, he had never before produced the lyric sheets to anyone, including Maxwood. (See Exs. 52-56, 73-75; Tr. 115:22-117:5, 222:17-223:25.)

Prior to Chmielinski's receipt of the Studio
Recording, the only alleged lyric sheet ever provided to
anyone was Exhibit 51. As alleged in the Complaint,
Exhibit 51 supposedly represented the Jam Sessions Song as
it existed at the time of the Studio Recording. Because of
the writing implements Chmielinski used in creating Exhibit
51 and the newly-located lyric sheets, their dates cannot
be determined by forensic testing. (Tr. 115:1-117:5,
222:17- 223:25; Ex. RRRR at 209:14-22, 210:3-210:9, 211:24-
212:8, 212:21-23, 213:2-18.)

Chmielinski identified Exhibit 51 as the final
lyric sheet he created for the Jam Sessions Song. (Tr.
115:17-21, 160:18-21.) However, by the time Chmielinski
first delivered Exhibit 51 to Maxwood, Mezmerize had been
commercially released for more than a year, and Chmielinski
admittedly had purchased and listened to "B.Y.O.B." (Ex.
RRRR at 206:18-22; Tr. 110:1-10, 222:6-223:3.)

As discussed above, the Studio Recording
contradicted the story as set forth in the Complaint,
because it did not contain the lyrics or resemble the song
structure from Exhibit 51. After learning of this
contradiction, Chmielinski testified that he and Malakian

40

supposedly continued to work together on the Jam Sessions
song for an additional "seven to eight months" and that he
created Exhibit 51 at the end of 2003.  (Tr. 115:1-117:5,
160:18-161:7, 215:10-217:9, 222:6-223:3.)  During cross
examination Chmielinski testified to a different timeline
after it became clear that his original sworn timeline
regarding the Studio Recording was inaccurate.

          Because Chmielinski's testimony about the
creation of Exhibit 51 changed materially several times,
the date of creation of Exhibit 51 cannot be determined,
and no other witness saw Exhibit 51 prior to the commercial
release of "B.Y.O.B.," Chmielinski's testimony concerning
Exhibit 51 is not credible.

          Chmielinski testified that Exhibit 73 reflects
the lyrics to the Boom Box Recording.  (Tr. 115:11-14,
218:7-16.)  Contrary to Chmielinski's testimony, including
his recitation of the lyrics from Exhibit 73 over the Boom
Box Recording, virtually none of the lyrics on Exhibit 73
can be heard on the Boom Box Recording — except the lines,
"Why don't presidents fight the war/Wasn't it the way it
was before," which Malakian wrote — and no other lyrics
from the commercially released "B.Y.O.B." can be heard.

41

(Compare Ex. F at Track 1 with Ex. 73; compare Ex. F at
Track 1 with Ex. A at CD, Track 2; Tr. 797:19-800:2, 955:6-
13, 957:1-958:10.)

Chmielinski testified that Exhibit 74 reflects
the lyrics to the Studio Recording. (Tr. 69:12-24, 73:5-8,
115:15-16, 218:7-10.) Again, contrary to Chmielinski's
testimony, including his recitation of the lyrics over the
Studio Recording, virtually none of the lyrics on Exhibit
74 are sung on the Studio Recording. Again, the only
exceptions are the lines, "Why don't presidents fight the
war/Wasn't it the way it was before," which Malakian wrote,
and the line, "Beverly Hills High School," which does not
appear in System of a Down's "B.Y.O.B." (Compare Ex. 2 at
Track 2 with Ex. 74; Ex. A; Tr. 210:23-211:9, 800:8-803:5,
958:12-960:21.)

With the exception of the "Why don't presidents
fight the war" lyric and a few other words and phrases that
do not appear in "B.Y.O.B.," none of lyrics on Exhibits 73
or 74 are contained on the Boom Box Recording or the Studio
Recording, and no other lyrics of "B.Y.O.B." can be heard.
(Ex. F at Track 1; Ex. 2 at Track 2; Exs. 73-74; Ex. A at

42

CD, Track 2 and D0994; Tr. 210:23-211:9, 795:16-25, 797:13-803:5.)

The authenticity of the newly-discovered lyric sheets, which purport to represent the alleged continuing work by Chmielinski and Malakian on the Jam Sessions Song after the Studio Recording, was not established. Their appearance after the Studio Recording was produced in discovery, contradicting the story in the Complaint, raises serious questions. No recordings correspond to these lyric sheets and there is no evidence or witnesses to corroborate Chmielinski's claimed contemporaneous creation of these lyric sheets. It would also be a virtually-impossible coincidence for Chmielinski to have closely paraphrased, at an earlier time, the distinctive lyrics written by Tankian in his poetry journals. (Tr. 646:11-15, 647:23-648:7, 649:3-14, 652:20-653:9; Ex. L at D0969, 0980; Ex. M.)

Exhibit 51 also incorporates a suggestion made by System of a Down's producer, Rick Rubin ("Rubin"), to chant the line, "Why do they always send the poor?," right after the guitar introduction in "B.Y.O.B." The System Rehearsal Recording does not reflect this change, which is consistent with Malakian's testimony that this suggestion was made by

43

Rubin later in the rehearsal/recording process.  (Tr.
819:9-820:19.)  Thus, in addition to lyrics written by
Tankian, Chmielinski's "lyric sheets" also incorporate yet-
to-be-made changes made by Rubin.  The inference is that
Chmielinski created Exhibit 51 from the commercially
released version of "B.Y.O.B."

       The weight of the evidence compels the conclusion
that these lyric sheets were fabricated after the Studio
Recording was produced and Chmielinski's story as set forth
in the Complaint was shown to be untrue.  The lyric sheets
do not constitute credible evidence of authorship by
Chmielinski.  (Tr. 212:6-7, 213:11-25, 217:25-218:16,
222:6-25.)

       Accordingly, consistent with the weight of the
evidence and the testimony of Malakian, Hill, Tankian and
Dolmayan, Malakian and Tankian are the sole authors of
"B.Y.O.B." as reflected on the liner notes of Mezmerize and
as reflected on the contemporaneous chart created in May
2005 by Tankian.  (Ex. A at D0994; Ex. R; Tr. 670:17-24,
731:17-732:8, 813:8-816:22, 830:4-10.)

**Conclusions**

## Chmielinski Is not a Joint Author of "B.Y.O.B."

Under the Copyright Act, a "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101. An individual is a co-author of a joint work if:  (1) he made independent copyrightable contributions to the work; and (2) both parties fully intended to be co-authors. Thomson v. Larson, 147 F.3d 195, 200 (2d Cir. 1998); Childress v. Taylor, 945 F.2d 500, 507-09 (2d Cir. 1991); Design Options, Inc. v. BellePointe, Inc., 940 F. Supp. 86, 90 (S.D.N.Y. 1996).

By statute, each author is entitled to an equal undivided interest in the copyright of a joint work.   17 U.S.C. § 201(a).  The presumption of equal ownership may only be altered by an express written agreement in writing signed by both parties.  See Papa's-June Music, Inc. v. McLean, 921 F. Supp. 1154, 1158 (S.D.N.Y. 1996) ("[T]he writing requirement of Section 204(a) [governing copyright

45

transfers] is applicable to transfers between joint authors.").

A contribution to a work is copyrightable if it (1) is independently created by the author and (2) possesses at least some minimal degree of creativity. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991). The requisite level of creativity is extremely low, and "[t]he vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude humble or obvious' it might be." Maurizio v. Goldsmith, 84 F. Supp. 2d 455, 466-67 (S.D.N.Y.), aff'd, 230 F.3d 518 (2d Cir. 2000) (quoting Feist, 499 U.S. at 345). There is no requirement that "the respective contributions made by each joint author must be equal either in quantity or quality." 1-6 Nimmer on Copyright § 6.03; see also Baker v. Robert I. Lappin Charitable Found., 415 F. Supp.2d 473, 487 (S.D.N.Y. 2006) ("equality in quantity of contribution is not required" for a joint work).

In Thomson, the court considered a "nuanced inquiry into the factual indicia of ownership and authorship," including factors such as how the parties

46

regarded themselves in terms of: (1) billing and credit;
(2) decision-making and creative control; and (3) the right
to enter into third-party contracts.   147 F.3d at 201
(citing Childress, 945 F.2d at 508 ("[J]oint authorship can
exist without any explicit discussion of this topic by the
parties.")).

An author's attribution of the work is
"persuasive proof" as to whether the work was intended to
be joint because the manner in which the parties "bill or
credit" themselves is "a window [into] the mind of the
party who is responsible for giving the billing or the
credit."   Thomson, 147 F.3d at 203 (internal citation
omitted).   Malakian credited Chmielinski as a gift and so
expressed it to Chmielinski.   There is no evidence of any
communication between Malakian and Chmielinski expressing
their intent to share ownership.

The listing of Chmielinski as an "author" in two
separate copyright registrations with the Copyright Office
(Exs. 6, 7) has been established factually as a mistake,
finally corrected.   The same mistake resulted in the
"final" label copy for the album on which the song appears
(Ex. 33), the emails among Chmielinski's representatives

47

expressly confirming his co-authorship status (Exs. 24-30),
officially released sheet music for the song (Exs. 17, 18,
21, 22) and a registration with a public performance
society (Ex. 49).

The evidence as found above established that the
only portions of the Jam Sessions Song, including both
lyrics and music, that were later incorporated within
"B.Y.O.B." were written exclusively by Malakian.  Other
than the limited pieces of the Jam Sessions Song
incorporated by Malakian in "B.Y.O.B.," the remainder of
"B.Y.O.B." was written by Malakian and Tankian prior to and
during the rehearsal process for System of a Down's next
albums, Mezmerize and Hypnotize.  Malakian used a modified
version of the Jam Sessions Song as the bridge section of
"B.Y.O.B." and wrote the remainder of the music and chorus
lyrics to "B.Y.O.B." in his usual songwriting practice.  He
brought the song to System of a Down in the same manner as
he had brought dozens of previous songs to the band.

The System Rehearsal Recording (Ex. D) and
Tankian's poetry journals, along with the trial testimony
of Malakian, Tankian and Dolmayan, establish that Tankian
wrote the verse lyrics to "B.Y.O.B.," consistent with his

48

customary practice in writing lyrics for songs that
Malakian brought to the band in an unfinished state.

Since Chmielinski did not author any portion of
the song "B.Y.O.B.," Maxwood's request for a declaratory
judgment that Chmielinski was a co-author of "B.Y.O.B." is
denied.

### Neither the Phrase "Communist Nation" nor the Word "Nation" Is Independently Copyrightable

The party claiming to be joint author must prove
that he contributed independently copyrightable material to
the purported joint work.  Design Options, 940 F. Supp. at
90; Childress, 945 F.2d at 506-07.  Malakian testified that
his decision to give Chmielinski a 2% royalty interest was
based, in part, on the fact that he thought that
Chmielinski uttered the unprotectible phrase "communist
nation" on the Studio Recording.  (Chmielinski testified
that he said "computer nation," not "communist nation.")
Malakian wanted to give him part of the royalties for
inspiring his use of the equally unprotectible phrase
"fascist nation" on the bridge section of "B.Y.O.B."

Neither "computer nation" nor "communist nation" is an independently copyrightable phrase.  In any event, the only commonality between the "B.Y.O.B." lyric and either phrase is the word "nation," which is not independently copyrightable.  See Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1072-73 (2d Cir. 1992) (single words or short phrases are not copyrightable); Bell v. Blaze Magazine, No. 99 Civ. 12342, 2001 WL 262718, at *2 (S.D.N.Y. Mar. 16, 2001) ("Words and short phrases, such as titles or slogans, are insufficient to warrant copyright protection, as they do not exhibit the minimal creativity required for such protection.")

Moreover, even if a short phrase were copyrightable, merely suggesting or contributing minor bits of expression is insufficient to qualify for joint authorship.  See Childress, 945 F.2d at 509 (holding that joint authorship cannot be based on incidental suggestions and "minor bits of expression"); Design Options, 940 F. Supp. at 90.

Accordingly, even assuming that Chmielinski inspired Malakian's use of the phrase "fascist nation" in the bridge of "B.Y.O.B.," such de minimis contribution is

insufficient to constitute an independently copyrightable element of "B.Y.O.B."

### Maxwood Has not Established the Requisite Intent

The requisite intent to create a joint work exists when the putative joint authors intend to regard themselves as joint authors. Childress, 945 F.2d at 507-08; Design Options, 940 F. Supp. at 90; see also Thomson, 147 F.3d at 201-02. In our circuit, "the contribution even of significant language to a work does not automatically suffice to confer co-author status on the contributor. Under Childress, a specific finding of mutual intent remains necessary." Thomson, 147 F.3d at 202; see Childress, 945 F.2d at 508; Ulloa v. Universal Music & Video Distrib. Corp., 303 F. Supp. 2d 409, 418 (S.D.N.Y. 2004).

Where one party retains the right to make final decisions regarding the content of the work, that right weighs in favor of finding that the party did not intend to be a joint author. See Thomson, 147 F.3d at 202-203; Caffey v. Cook, 409 F. Supp. 2d 484, 500 (S.D.N.Y. 2006) (plaintiff's right to make final decisions as to the

arrangement and dialogue of a musical stage show weighed in favor of Court's holding that plaintiff did not intend to be joint authors with defendants). It is undisputed that Chmielinski had no right to make any decisions regarding the content of "B.Y.O.B." and has never acted or claimed to the contrary.

The evidence also shows that Malakian never regarded Chmielinski as a co-author, because Chmielinski did not author any portion of either the Jam Sessions Song or "B.Y.O.B." Moreover, the potential project with Malakian, Chmielinski and Hill was Malakian's project. Malakian controlled the jam sessions, which were at his house, in his music room. Hill testified that Malakian had written all of the songs they played, that Malakian directed Hill and Chmielinski as to how to perform the songs and that Chmielinski wrote nothing.

Consistent with their exclusive authorship, Malakian and Tankian credited themselves as the writers of "B.Y.O.B." on the liner notes to Mezmerize and in Tankian's chart. (Exs. A, R.) See Thomson, 147 F.3d at 203 ("[B]illing or credit is a window on the mind of the party who is responsible for giving the billing or the credit.

And a writer's attribution of the work to herself alone is persuasive proof that she intended this particular piece to represent her own individual authorship, and is prima facie proof that the work was not intended to be joint." (internal quotations, citations, brackets and ellipses omitted)); Caffey, 409 F. Supp. 2d at 500.  In contrast, Chmielinski did not object to the credits reflected on the liner notes to Mezmerize or the 2% gift for more than a year after learning of them.

Chmielinski was subject to an exclusive songwriter agreement with EMI Music Publishing (Ex. III, ¶¶ 4.01, 4.04, 6.01-6.02.)  Under that agreement, he was obligated to deliver all songs he wrote or co-wrote during the term to EMI.  It is undisputed that, inconsistent with his current claim of co-authorship, Chmielinski did not deliver his alleged interest in "B.Y.O.B." to EMI.  (Tr. 247:23-249:7, 249:24-252:19.)

Mistakes, clerical or otherwise, do not constitute admissions.  See, e.g., Marathon Enters., Inc. v. Schroter GMBH & Co., No. 01 Civ. 0595, 2003 WL 355238, at *4 (S.D.N.Y. Feb. 18, 2003); Dortz v. City of New York, 904 F. Supp. 127, 146 n.6 (S.D.N.Y. 1995); Moffitt v.

53

Supervalu, Inc., No. 08-3216, 2009 WL 1285840, at *2 (C.D.
Ill. May 7, 2009).

Asher was not authorized to make these mistakes
and these mistakes cannot transform Chmielinski into an
author of a song that he, in fact, did not write.  Even if
such a mistake could create authorship where none exists,
the mistake in affording Chmielinski a songwriter credit
was limited a 2% interest, not a 50% share of the song.

Errors in copyright registration occur and the
system provides for corrections to be made to erroneous
filings without compromising the validity of the copyright.
See Eckes v. Card Prices Update, 736 F.2d 859, 861-62 (2d
Cir. 1984); United States v. Backer, 134 F.2d 533, 536 (2d
Cir. 1943); Bourne Co. v. Walt Disney Co., No. 91 Civ. 344,
1992 WL 489766, at *1 (S.D.N.Y. Dec. 1, 1992).

Under Federal Regulations governing copyrights, a
supplementary registration may be made either to correct or
to amplify the information in a basic registration, and
further, "[a] correction is appropriate if information in
the basic registration was incorrect at the time that basic
registration was made, and the error is not one that the

54

Copyright Office itself should have recognized." 37 C.F.R. § 201.5(b)(2)(i). Evidence in a supplemental registration that rebuts information in an original registration similarly rebuts any presumption accorded the facts on the original registration. Estate of Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 165-67 (2d Cir. 2003).

Maxwood has failed to establish that the parties intended Chmielinski to be a joint author.

## Conclusion

Based on the findings and conclusions set forth above, judgment will be entered dismissing the claims of Maxwood, and declaring that defendants are the sole authors of the song "B.Y.O.B." as commercially released by System of a Down.

Enter judgment on notice.

So ordered.

New York, NY
May 17, 2010

ROBERT W. SWEET
U.S.D.J.

55